UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE
COMMISSION,

Plaintiff,

-against-

NAUMAN A. ALY,

Defendant.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/27/18

**MEMORANDUM
OPINION & ORDER**

16 Civ. 3853 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

On May 24, 2016, Plaintiff Securities and Exchange Commission (the "SEC")

filed a Complaint against pro se Defendant Nauman A. Aly, alleging that Aly fraudulently

manipulated the price of publicly-traded securities by placing false information on the SEC's

public database, EDGAR. (See Cmplt. (Dkt. No. 1) ¶ 1) The SEC alleges that Aly's sale of

securities at artificially-inflated prices constituted securities fraud in violation of Section 17(a) of

the Securities Act of 1933, Section 10(b) of the Securities Exchange Act of 1934, and Rule 10b-

5. (See id. ¶¶ 44-51)

The parties have cross-moved for summary judgment. (SEC Mot. (Dkt. No. 60;

Def. Mot. (Dkt. No. 66)) Aly has also moved to strike the report of the SEC's expert, Alan

Grigoletto. (Mot. to Strike (Dkt. No. 65))

For the reasons stated below, the SEC's motion for summary judgment will be

granted, and Aly's motion for summary judgment and motion to strike will be denied.

## BACKGROUND[1]

## I.     FACTS

Defendant Nauman Aly is a citizen of Pakistan and resides in Karachi. (Pltf. R. 56.1 Stmt. (Dkt. No. 62) ¶¶ 1, 3) Aly does not have any formal training in business or investments, but learned about investing over the internet, and began investing his own money about ten years ago. (Id. ¶¶ 8, 13-15; Aly Dep. Tr. (Dkt. No. 62-41) at 23-24)[2]

Integrated Device Technology, Inc. ("IDTI") is a Delaware corporation with its principal place of business in San Jose, California. (Pltf. R. 56.1 Stmt. (Dkt. No. 62) ¶ 19) IDTI manufactures semiconductors. (Id. ¶ 18)

This action arises out of Aly's purchase of 1,850 IDTI call options and his filing of a Schedule 13D regarding IDTI less than twenty minutes later. (See id. ¶¶ 33, 47; Aly Dep. Tr. (Dkt. No. 62-42) at 44-45)

### A.     Aly's EDGAR Accounts

The SEC's Electronic Data Gathering, Analysis, and Retrieval system – known as "EDGAR" – accepts and publicly releases documents that companies and individuals have filed with the SEC. (Id. ¶ 20) EDGAR's primary purpose is to increase the efficiency and fairness of

---

[1] To the extent that this Court relies on facts drawn from a party's Local Rule 56.1 Stmt., it has done so because the opposing party has either not disputed those facts or has not done so with citations to admissible evidence. See Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted." (citations omitted)). Where a party opposing a motion disputes the movant's characterization of cited evidence, and has presented an evidentiary basis for doing so, the Court relies on the adversary's characterization of the evidence. See Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001) (court must draw all rational factual inferences in non-movant's favor in deciding summary judgment motion). Unless otherwise indicated, the facts cited by the Court are undisputed.

[2] Unless otherwise indicated, the page numbers of documents referenced in this Order correspond to the page numbers designated by this District's Electronic Case Filing system.

2

the securities markets by providing public access to time-sensitive corporate information filed with the SEC. (Id. ¶ 21)

In order to publicly file documents through EDGAR, a filer must complete an electronic application – a Form ID. (Id. ¶ 23) After an application is received, EDGAR sends an automated email to the email address on the Form ID application. (Id. ¶ 24) The automated email contains a unique Central Index Key ("CIK") number which serves as the filer's logon ID for EDGAR. (Id.) The CIK code enables companies and individuals to file documents with the Commission electronically through EDGAR. (Id. ¶ 25)

On August 31, 2015, Aly submitted a Form ID Application to EDGAR in his name – "Nauman Aly A" – in order to obtain a logon ID. (Id. ¶ 29) On September 1, 2015, EDGAR issued Aly a CIK code that allowed him to access and file documents on EDGAR. (Id. ¶ 30)

On February 24, 2016, Aly submitted another Form ID Application to EDGAR under the name "EDGAR SOLUTIONS." (Id. ¶ 31) On February 24, 2016, EDGAR issued Edgar Solutions a CIK code to access and file documents on EDGAR. (Id. ¶ 32)

## B.    Aly's Purchase of IDTI Call Options

On April 12, 2016, at 11:50 a.m.,[3] Aly purchased 1,850 IDTI call options[4] with a strike price of $20.00 and an expiration date of April 15, 2016. (Id. ¶ 33) At the time Aly purchased the IDTI call options, IDTI was trading at approximately $19.01 per share. (Id. ¶ 35) Aly paid $18,500 for the call options, plus $1,466.17 in brokerage fees. (Id. ¶ 34; Interactive

---

[3] Unless otherwise specified, all time references are to Eastern Standard Time.

[4] Call option contracts give the owner a right to buy 100 shares of the underlying security at a specified price – referred to as the "strike price" – for a certain fixed period, until the call option expires. (Grigoletto Decl., Ex. A (Grigoletto Expert Report) (Dkt. No. 62-17) ¶ 17)

3

Brokers Activity Stmt. (Dkt. No. 62-8) at 2; Grigoletto Decl., Ex. A (Grigoletto Expert Report) (Dkt. No. 62-17) ¶ 28)[5] Because each option gave Aly the right to buy 100 shares of IDTI at $20 per share, his purchase reflected a premium, or cost, of ten cents per share. (See Grigoletto Decl., Ex. A (Grigoletto Expert Report) (Dkt. No. 62-17) ¶¶ 28, 31)

Aly's April 12, 2016 purchase of IDTI call options was unusually large in comparison with other market participants who purchased IDTI call options at this time. (Grigoletto Decl. (Dkt. No. 62-17) ¶ 5; Grigoletto Decl., Ex. A (Grigoletto Expert Report) (Dkt. No. 62-17) ¶¶ 26-27) For example, on April 11, 2016, only 30 IDTI call options with a strike price of $20 and an expiration date of April 15, 2016 were traded. (Grigoletto Decl. (Dkt. No. 62-17) ¶ 6; Grigoletto Decl., Ex. A (Grigoletto Expert Report) (Dkt. No. 62-17) ¶ 30) Moreover, across all strike prices, only 172 IDTI call options with an expiration date of April 15, 2016 were traded on April 11, 2016. (Grigoletto Decl. (Dkt. No. 62-17) ¶ 7; Grigoletto Decl., Ex. A (Grigoletto Expert Report) (Dkt. No. 62-17) ¶ 30) Accordingly, Aly's April 12, 2016 purchase of 1,850 call options amounts to more than ten times the total number of IDTI call options traded on the previous day. (Grigoletto Decl. (Dkt. No. 62-17) ¶ 8; Grigoletto Decl., Ex. A (Grigoletto Expert Report) (Dkt. No. 62-17) ¶ 30)

In his expert report, Grigoletto opines that Aly's call option purchase was highly speculative. It constituted a near $20,000 bet that the price of IDTI stock would rise more than a dollar over a three days. (See Grigoletto Decl., Ex. A (Grigoletto Expert Report) (Dkt. No. 62-17) ¶¶ 28, 31) When options expire "out-of-the-money," they are worthless; there is no residual

---

[5] As explained below, this Court has concluded that Aly's motion to strike Grigoletto's expert report should be denied. Moreover, although Aly disputes the facts and conclusions stated in the expert report, he cites no admissible evidence to the contrary. (See Def. R. 56.1 Stmt. (Dkt. No. 68) ¶¶ 35-45) For these reasons, this Court cites to Grigoletto's report in its factual statement.

4

value and the purchaser loses his entire investment in the options. (See id. ¶¶ 19, 31)

Accordingly, unless IDTI stock rose to or above \$20.10 (the break-even point for call options with a strike price of \$20, sold at 10 cents), Aly would lose his entire investment. (Id. ¶ 31)

## C. Aly's Schedule 13D Filing

On April 12, 2016 – the same day that Aly purchased the IDTI call options – he accessed EDGAR and placed on the system an IDTI-related document. (Pltf. R. 56.1 Stmt. (Dkt. No. 62) ¶¶ 46-47)

At 11:58 a.m. that day, Aly logged into EDGAR using the CIK code that he had obtained under the name of "EDGAR SOLUTIONS." (Id. ¶ 46) At 12:08 p.m., Aly filed a Schedule 13D through Edgar relating to IDTI. (Id. ¶ 47; Edgar Submission Information for Schedule 13D (Dkt. No. 62-14) at 2) A Schedule 13D must be submitted to the SEC within 10 days by anyone who acquires beneficial ownership of more than 5% of any class of publicly traded securities in a public company such as IDTI. See 15 U.S.C. § 78m(d); 17 C.F.R. § 240.13d-101.[6] The Schedule 13D was signed by Aly, and lists Aly's name on the cover with a Portland, Oregon address. (Pltf. R. 56.1 Stmt. (Dkt. No. 62) ¶ 48; Schedule 13D (Dkt. No. 62-11) at 1, 26)

---

[6] "Pursuant to section 13(d), the SEC requires the beneficial owner of more than 5% of a class of stock to make certain disclosures on a Schedule 13D." Azurite Corp. v. Amster & Co., 52 F.3d 15, 18 (2d Cir. 1995) (citing 17 C.F.R. § 240.13d-101); In re Luxottica Grp. S.p.A., Sec. Litig., 293 F. Supp. 2d 224, 234 (E.D.N.Y. 2003) ("Section 13(d) states that 'any person who, after acquiring . . . the beneficial ownership of any equity security . . . is directly or indirectly the beneficial owner of more than 5% of such class shall, within 10 days after such acquisition' file with the SEC a statement containing certain information." (alterations in original) (quoting 15 U.S.C. § 78m(d))). The purpose of the requirement "'is to ensure that public shareholders who are confronted by a cash tender offer for their stock will not be required to respond without adequate information regarding the qualifications and intentions of the offering party.'" In re Luxottica Grp. S.p.A., Sec. Litig., 293 F. Supp. 2d at 234 (quoting Rondeau v. Mosinee Paper Corp., 422 U.S. 49, 58 (1975)).

5

The Schedule 13D reported that a 5.1% interest in IDTI was held by Aly and six

others: Libin Sun, Liang Xu, Haiping Zhou, Zhibin Lin, Junping Chen, and Libin Yang

(collectively, the "Reporting Group"). (Pltf. R. 56.1 Stmt. (Dkt. No. 62) ¶¶ 50, 52; Schedule 13D

(Dkt. No. 62-11) at 5-19) The Schedule 13D states that it is "filed jointly by the Reporting

Persons" (Schedule 13D (Dkt. No. 62-11) at 19), who own the following amounts of IDTI

securities:

- Libin Sun: 2,410,886 shares of IDTI common stock plus 36,000 IDTI call options – representing 3,600,000 shares of IDTI common stock – with strike prices ranging from \$0.25 to \$0.38 and expiration dates in November 2016. (Pltf. R. 56.1 Stmt. (Dkt. No. 62) ¶¶ 52-55; Schedule 13D (Dkt. No. 62-11) at 5-6) According to the Schedule 13D, these holdings allegedly amounted to 4.4% of IDTI's outstanding shares. (Pltf. R. 56.1 Stmt. (Dkt. No. 62) ¶ 52; Schedule 13D (Dkt. No. 62-11) at 5)

- Liang Xu: 260,433 shares of IDTI common stock. (Pltf. R. 56.1 Stmt. (Dkt. No. 62) ¶ 52; Schedule 13D (Dkt. No. 62-11) at 7)

- Haiping Zhou: 130,775 shares of IDTI common stock. (Pltf. R. 56.1 Stmt. (Dkt. No. 62) ¶ 52; Schedule 13D (Dkt. No. 62-11) at 9)

- Zhibin Lin: 75,915 shares of IDTI common stock. (Pltf. R. 56.1 Stmt. (Dkt. No. 62) ¶ 52; Schedule 13D (Dkt. No. 62-11) at 11)

- Junping Chen: 72,000 shares of IDTI common stock. (Pltf. R. 56.1 Stmt. (Dkt. No. 62) ¶ 52; Schedule 13D (Dkt. No. 62-11) at 13)

- Libin Yang: 70,877 shares of IDTI common stock. (Pltf. R. 56.1 Stmt. (Dkt. No. 62) ¶ 52; Schedule 13D (Dkt. No. 62-11) at 15)

- Nauman A. Aly: 185,000 shares in IDTI call options. (Pltf. R. 56.1 Stmt. (Dkt. No. 62) ¶ 52; Schedule 13D (Dkt. No. 62-11) at 17-18)

There is no evidence, however, that an individual named Libin Sun held 36,000

IDTI call options – with strike prices ranging from \$0.25 and \$0.38 and November 2016

expiration dates – at the time that Aly filed the Schedule 13D. To the contrary, Grigoletto's

expert report concludes that Libin Sun's reported holding of 36,000 IDTI call options is false.

6

(Grigoletto Decl., Ex. A (Grigoletto Expert Report) (Dkt. No. 62-18) ¶ 54)  Grigoletto opines that Sun's option position was fabricated based on following facts:

- The nature of the reported strike prices.  Grigoletto notes that the Schedule 13D reported call options on 3,600,000 shares, with strike prices ranging from $0.25 to $0.38, and explains – based on his experience – that "[t]hese reported strike prices are nonsensical and far too low" in comparison with typical strike prices.  (Id. ¶ 55)

- The fact that call options with the specific November expiration dates reported in the Schedule 13D did not exist "[u]p to and including the date of the Schedule 13D filing."  (Id. ¶ 56)

- A statement in the Schedule 13D suggesting that the call options were purchased more than 60 days before the April 12, 2016 filing of the Schedule 13D.  (Id. ¶ 57)  Grigoletto explains that call options with November expiration dates were unavailable until March 21, 2016.  (Id.)  Accordingly, Libin Sun could not have purchased call options with these characteristics until at least March 21, 2016, which was within sixty days of the Schedule 13D filing.  (Id.)

- The alleged size of Libin Sun's option position.  (Id. ¶ 58)  Grigoletto explains that open interest[7] would reflect the held options in IDTI call options and that between March 21, 2016 (the first listed trading day for IDTI options expiring in November 2016) and April 12, 2016, the maximum total open interest only reflected 31 option contracts across all strike prices.  (Id. ¶ 59)  Grigoletto further explains that there was "not nearly enough open interest in all IDTI November call options for Libin Sun to have acquired call options representing 3,600,000 shares of IDTI."  (Id.)

- An examination and query of the Large Options Positions Reporting system by SEC staff, which revealed that no over-the-counter position reflecting 36,000 IDTI call options, as described in the Schedule 13D, existed.  (Id. ¶ 60; McCluskey Decl. (Dkt. No. 7) ¶ 35; McCluskey Decl. (Dkt. No. 62-20) ¶ 10)  Grigoletto explains that FINRA rules require all FINRA members to report positions in conventional or over-the-counter options if they meet a 200-contract threshold.  (Grigoletto Decl., Ex. A (Grigoletto Expert Report) (Dkt. No. 62-18) ¶ 60)  If the option position reported in the Schedule 13D existed, it should have been reported in the Large Options Positions Reporting system.  (Id. ¶¶ 60-61)

---

[7]  Option "open interest" is the number of open options contracts for a given security that have been traded and not yet closed out (i.e., expired, exercised, or closed out by an offsetting trade).  (Id. ¶ 23)  Open interest increases when investors add to existing options positions, and it decreases when the positions are closed out, so the amount of open interest provides a measure of the number of outstanding options contracts or commitments traded on exchanges.  (Id.)

There are also no records of any individual named Libin Sun holding 2,410,886 shares of IDTI stock. (See McCluskey Decl. (Dkt. No. 62-20) ¶¶ 11-13) The records of IDTI's transfer agent[8] from April 11, 2016 – the day before Aly filed the Schedule 13D – do not identify Libin Sun as a beneficial owner of any IDTI stock. (Id. ¶¶ 12-13)

The Schedule 13D also states that the Reporting Group had sent a letter to IDTI's board of directors offering to acquire all of the outstanding shares of IDTI common stock for $32.00 per share in cash, and attached a copy of the purported letter to the Schedule 13D. (Schedule 13D (Dkt. No. 62-11) at 21, 28-29) The $32.00 offer price referenced in the letter reflects a 65% premium above the closing price of IDTI stock on the prior day. (Pltf. R. 56.1 Stmt. (Dkt. No. 62) ¶ 59)

A draft merger agreement was also attached to the Schedule 13D. (Schedule 13D (Dkt. No. 62-11) at 32-53) The draft merger agreement identified two entities – purportedly incorporated in Delaware – that the Reporting Group would use to acquire IDTI: SUN Parent, Inc., and SUN Merger Sub, Inc. (Id. at 39) Neither SUN Parent, Inc., nor SUN Merger Sub, Inc. existed as of April 12, 2016, however. (Pltf. R. 56.1 Stmt. (Dkt. No. 62) ¶ 71)

On April 12, 2016, at approximately 12:06 p.m., Aly sent an email to the general investor relations mailbox of IDTI and IDTI's outside public relations firm, Blueshirt Group. Aly's email read:

Integrated Device Technology, Inc. Proposal Letter + Draft
ir@idt.com
Suzanne@blueshirtgroup.com

---

[8] A transfer agent is an entity assigned by a public company to keep a record of the holders of a company's outstanding equity and debt securities. (Id. ¶ 11)

8

(See April 12, 2016 mail (Dkt. No. 62-22) at 21; Brandalise Decl. (Dkt. No. 62-21) ¶ 12) The Schedule 13D and the tender offer letter attached to the Schedule 13D were attached to Aly's email. (See id. at 3, 33-54) Aly did not contact anyone directly at IDTI to alert them to the proposed tender offer. (See Aly Dep. Tr. (Dkt. No. 62-42) at 42; Brandalise Decl. (Dkt. No. 62-21) ¶ 12) Aly testified that Huang – one of Sun's legal advisors – was supposed to contact IDTI. (Aly Dep. Tr. (Dkt. No. 62-42) at 43; Aly Dep. Tr. (Dkt. No. 69-45) at 68)

IDTI's senior management did not learn about Aly's April 12, 2016 email until August 18, 2016, about four months later. (Brandalise Decl. (Dkt. No. 62-21) ¶ 12) At the time Aly's Schedule 13D was filed, no one at IDTI had received an offer to acquire all of the outstanding shares of IDTI. (Brandalise Decl. (Dkt. No. 62-21) ¶¶ 7-10) Other than Aly's April 12, 2016 email – which IDTI's senior management did not learn of until August 18, 2016 – IDTI did not receive any communications from any other member of the Reporting Group. (Id. ¶ 13)

**D.     Market Reaction to the Schedule 13D, and Aly's Sale of His Call Options**

It is common for the stock market to react to the filing of a Schedule 13D in anticipation of a potential tender offer or merger proposal. (Grigoletto Decl. (Dkt. No. 62-17) ¶ 4; Grigoletto Decl., Ex. A (Grigoletto Expert Report) (Dkt. Nos. 62-17, 62-18) ¶¶ 26-27) Because an acquirer must pay a premium for the acquisition, the stock price of the target company will typically increase in the short term. (Grigoletto Decl., Ex. A (Grigoletto Expert Report) (Dkt. No. 62-17) ¶ 27) Merger proposals also generally result in an increase to the price of call options on the stock of the target company, because the price of options depends on the price of the underlying stock. (Id.)

After Aly filed his Schedule 13D on EDGAR at 12:08 p.m. on April 12, 2016, at 12:09 p.m. the contents of the Schedule 13D were published on Bloomberg. (Id. ¶ 35) Shortly

9

thereafter, other news outlets began to report the contents of the Schedule 13D. (Id. ¶¶ 35-36)
When Aly's Schedule 13D was reported on Bloomberg at 12:09 p.m., IDTI's stock was trading at
$19.15. (Id. ¶ 38) By 12:17 p.m., IDTI's stock had reached $23.99 – a price increase of 26
percent within ten minutes. (Id. ¶ 38)

Trading is halted when the price of a stock increases by more than 10 percent of
the average share price from the previous five minutes of trading. (Id. ¶ 39) Here, the rapid
price increase in IDTI stock triggered a trading halt at 12:09:59 p.m. (Id.) According to a
NASDAQ database – other than in this instance – trading in IDTI stock was not halted at any
point between January 30, 2016 and January 30, 2017. (Id.) The trading halt suspended trading
in IDTI's stock for five minutes, and trading resumed at 12:15 p.m. (Id.)

Although IDTI's share price rose 26% in ten minutes on April 12, 2016, during
the six trading days before and after April 12, 2016, the maximum change in price in any ten
minute window was only 3%. (Id. ¶ 43) During this period, the maximum intraday change in
price was 5%, and the average intraday change was only 3%. (Id.) Moreover, the total trading
volume on April 12, 2016 was 637 percent higher than the average daily volume of the six
trading days prior to, and after, April 12, 2016. (Id. ¶ 45)

Between approximately 12:18 p.m. and 12:20 p.m., Aly sold his IDTI call options
for $447,740, making over $425,000 in profits from the sale. (Pltf. R. 56.1 Stmt. (Dkt. No. 62)
¶¶ 81-83)

At approximately 12:44 p.m. – after Aly had sold his call options – Aly filed an
"amended" Schedule 13D through EDGAR. (Id. ¶ 84) The amended Schedule 13D purported to
be an "exit filing." (Id. ¶ 86) Aly reported that he had sold his "call options referencing 185,000
shares of [IDTI] Common Stock for an aggregate consideration of $447,740," and that the

10

Reporting Persons did not hold an ownership interest of more than 5 percent of IDTI's outstanding shares. (Id. ¶ 87; Amended Schedule 13D (Dkt. No. 62-15) at 19)

## E.    Aly's Explanation of How He Came to Purchase IDTI Call Options

According to Aly, one day in February 2015 he was walking on a "food street" in Karachi, Pakistan, when he observed a stranger – who appeared to be Chinese – speaking on the phone in Urdu. (Pltf. R. 56.1 Stmt. (Dkt. No. 62) ¶ 89) After the man ended his phone call, he and Aly began talking. (See Aly Dep. Tr. (Dkt. No. 62-41) at 33) The man's name was Libin Sun, and Sun told Aly that he was a multi-millionaire investor from China who operated an investment firm. (See id. at 33-35)

Sun told Aly that he was working on a confidential deal to acquire IDTI, and he invited Aly to participate in the deal, which had not yet been proposed to IDTI. (Aly Dep. Tr. (Dkt. No. 62-42) at 12-15, 26; Pltf. R. 56.1 Stmt. (Dkt. No. 62) ¶ 93; Def. R. 56.1 Stmt. (Dkt. No. 68) ¶ 93) According to Aly, IDTI was valued at approximately $2.5 billion, and Sun proposed using debt and at least $600 million in equity for the acquisition. (Aly. Tr. (Dkt. No. 62-43) at 35-36) Aly claims that Sun asked him to keep the IDTI deal confidential, and warned Aly about "tipper liability." (Pltf. R. 56.1 Stmt. (Dkt. No. 62) ¶ 97; Aly Resp. to Interrogatories (Dkt. No. 62-45) at 3)

Aly further testified that – in May 2015 – he agreed to participate in the IDTI acquisition as an equity holder. (Aly Dep. Tr. (Dkt. No. 62-42) at 16; Pltf. R. 56.1 Stmt. (Dkt. No. 62) ¶ 99) Sun proposed lending Aly $25 million for Aly to purchase an equity stake in IDTI. (Aly Dep. Tr. (Dkt. No. 62-43) at 30)

According to Aly, between February 2015 and April 12, 2016, he met with Sun approximately seven times, and participated in approximately 50 video conferences with Sun

11

and/or his legal and financial advisors. (Pltf. R. 56.1 Stmt. (Dkt. No. 62) ¶ 98) Aly, Sun, and Sun's advisors discussed a variety of topics, including "IDTI business model, [Hart Scott Rodino] Act, Toehold positions/Regulation 13d-1, Post structure of the Parent, . . . terms of the Confidentiality Agreement, Merger Agreement terms, Poison Pills, debt and equity financing terms, federal statutes including the Securities Act and Exchange Act, Go Shop period[,] etc." (Id. (quoting Aly's November 3, 2016 Discovery Response (Dkt. No. 62-28) at 4)) Aly never met or communicated with other the Reporting Persons – Liang Xu, Haiping Zhou, Zhibin Lin, Junping Chen, or Libin Yang. (Pltf. R. 56.1 Stmt. (Dkt. No. 62) ¶ 101; Aly Dep. Tr. (Dkt. No. 62-42) at 12)

Aly communicated with Sun and his advisors over a software called "Beam." (Pltf. R. 56.1 Stmt. (Dkt. No. 62) ¶ 108; Aly Dep. Tr. (Dkt. No. 62-42) at 6-7; Aly Dep. Tr. (Dkt. No. 62-43) at 26-27) According to Aly, he received the Beam software through two USB flash-drives. (Aly Resp. to Interrogatories (Dkt. No. 62-45) at 2)

Aly testified that – as a result of his discussions with Sun and his advisors – he learned about "edgarizing" – the process of formatting and filing documents on EDGAR on behalf of others. (Pltf. R. 56.1 Stmt. (Dkt. No. 62) ¶ 110; Aly Dep. Tr. (Dkt. No. 62-42) at 17-18) Aly researched "edgarizing" on the internet, and formed Edgar Solutions in April 2015. (Pltf. R. 56.1 Stmt. (Dkt. No. 62) ¶ 111; Aly Dep. Tr. (Dkt. No. 62-42) at 17-21) According to Aly, during the first year of its existence, Edgar Solutions had no employees, no income, and no clients. (Pltf. R. 56.1 Stmt. (Dkt. No. 62) ¶ 114; Def. R. 56.1 Stmt. (Dkt. No. 68) ¶ 114)

Aly told Sun and his advisors in April 2015 that he had formed Edgar Solutions. (Aly Dep. Tr. (Dkt. No. 69-45) at 86) Afterwards, Sun and Mr. Huang – Sun's legal advisor – sent documents to Aly to test his "edgarizing" skills. (Id. at 88-90) At Huang's request, Aly

12

"made countless "[t]est" filings on the SEC's EDGAR system beginning in September 2015. (Aly Decl. (Dkt. No. 69) ¶ 6)

On April 12, 2016, Sun and Huang told Aly that they had decided to send a draft merger agreement and "Proposal Letter" to IDTI, and that they wanted him to send these documents by email to IDTI on behalf of the Reporting Group. (Aly Decl. (Dkt. No. 69) ¶ 7; Aly Dep. Tr. (Dkt. 62-42) at 34; Aly Dep. Tr. (Dkt. 69-45) at 99; Pltf. R. 56.1 Stmt. (Dkt. No. 62) ¶¶ 118-19)

After learning about the "proposal letter" and draft merger agreement, Aly decided to purchase IDTI call options, and told Sun and Huang of his plans. (Aly Dep. Tr. (Dkt. 69-45) at 99; Aly Decl. (Dkt. No. 69) ¶ 8; Pltf. R. 56.1 Stmt. (Dkt. No. 62) ¶¶ 119-20) According to Aly, he purchased the IDTI call options because the "stock was undervalued at that time," and he believed that the stock price would increase. (Aly Dep. Tr. (Dkt. No. 62-42) at 30-31)

Aly testified that after he told he told Sun and Huang about his call option purchase, they decided that the Reporting Group should file a Schedule 13D, because they now held a more than five percent ownership interest in IDTI. (Id. at 37) According to Aly, Mr. Huang prepared the Schedule 13D and sent it to Aly to file on EDGAR. (Id. at 38; Pltf. R. 56.1 Stmt. (Dkt. No. 62) ¶ 125) Aly testified that he filed the Schedule 13D using Edgar Solutions as the filing agent. (Aly Dep. Tr. (Dkt. No. 62-42) at 45) Aly further testified that he authorized Huang to put Aly's electronic signature on the document as a member of the Reporting Group. (Pltf. R. 56.1 Stmt. (Dkt. No. 62) ¶ 126; Aly Dep. Tr. (Dkt. No. 69-45) at 107-08)

Aly claims that when he filed the Schedule 13D, he believed the document was true and correct. (Pltf. R. 56.1 Stmt. (Dkt. No. 62) ¶ 88) Aly further states that when he filed the

13

Schedule 13D – at 12:08 p.m. on April 12, 2016 – he intended to hold his position in IDTI and increase his IDTI holdings. (Id.)

Aly did not learn anything new about IDTI or his IDTI call options between 12:08 and 12:18 p.m. on April 12, 2016, but at 12:18 p.m. he decided to sell his call options, because he "felt like doing so." (Aly Dep. Tr. (Dkt. No. 69-45) at 121-22; Pltf. R. 56.1 Stmt. (Dkt. No. 62) ¶ 130) Although Aly "wasn't that focused" on IDTI's stock price when the Schedule 13D was filed, he "did notice at the time of the filing, [that IDTI's stock] price did subsequently change," and that the value of his call options had increased. (Pltf. R. 56.1 Stmt. (Dkt. No. 62) ¶ 132; Aly Dep. Tr. (Dkt. No. 69-45) at 123-24)

Aly told Sun and his advisors that he had sold his IDTI call options, and Sun and Huang informed Aly that another Schedule 13D would have to be filed, because the Reporting Group's ownership interest in IDTI was no longer above five percent. (Pltf. R. 56.1 Stmt. (Dkt. No. 62) ¶ 135-37; Def. R. 56.1 Stmt. (Dkt. No. 68) ¶¶ 135-37; Aly Dep. Tr. (Dkt. No. 62-43) at 8-11) According to Aly, Huang prepared the amended Schedule 13 and sent it to Aly to "edgarize." (Pltf. R. 56.1 Stmt. (Dkt. No. 62) ¶ 139; Aly Dep. Tr. (Dkt. No. 69-45) at 127-31) Aly authorized Huang to put Aly's electronic signature on the amended Schedule 13. (Pltf. R. 56.1 Stmt. (Dkt. No. 62) ¶ 140; Aly Dep. Tr. (Dkt. No. 69-45) at 135)

When the amended Schedule 13D was filed, Aly intended to purchase IDTI stock at a later time. (Pltf. R. 56.1 Stmt. (Dkt. No. 62) ¶ 142; Aly Dep. Tr. (Dkt. No. 69-45) at 134) Aly did not purchase any IDTI stock on or after April 12, 2016, however. (Pltf. R. 56.1 Stmt. (Dkt. No. 62) ¶ 143; Aly Dep. Tr. (Dkt. No. 69-45) at 122-23)

Between 4:00 and 5:00 p.m. on April 12, 2016, Aly decided to leave the Reporting Group. (Aly Dep. Tr. (Dkt. No. 69-45) at 138-39) Aly didn't have any "particular reason" for

14

leaving the Reporting Group at that time, but "had a gut feeling" and wanted to "do something else instead." (Id. at 138) Aly informed Sun that he was leaving the Reporting Group, and Aly later dissolved Edgar Solutions because he "did not want to make it commercial" and "was bored of it." (Id. at 140, 144)

During discovery, the SEC requested that Aly produce all documents relating to his relationship or contact with Edgar Solutions, IDTI, Sun, Sun's legal advisors, and any other members of the Reporting Group. (SEC Doc. Prod. Request (Dkt. No. 62-29) ¶¶ 19-23, 26-39) In response to the SEC's document requests, Aly has not produced any correspondence or other documents concerning his alleged relationship with Sun or Sun's advisors. (See Nov. 3, 2016 Discovery Response (Dkt. No. 62-28) at 4-6; Nov. 22, 2016 Discovery Response (Dkt. No. 62-30) at 4-5) At his deposition, Aly testified that all of his communications with Sun and his advisors were "either lost or destroyed," that there were "no copies," and that the only evidence he had of those documents is his own testimony. (Aly Dep. Tr. (Dkt. No. 69-45) at 147-48)

Aly testified that after he left the Reporting Group, he had no need for these documents, and deleted many of them by the "end of April [2016]." (Id. at 148-49) Among the documents Aly deleted were documents relating to the proposed acquisition of IDTI, including drafts of EDGAR filings and financial documents that Sun gave to him. (Id. at 153-54)

Other responsive documents were destroyed when the "Beam" software got "corrupted" and Aly's laptop stopped working in mid-May 2016. (Id. at 148-50; Pltf. R. 56.1 Stmt. (Dkt. No. 62) ¶ 164) Aly disposed of his laptop at that time. (Aly Dep. Tr. (Dkt. No. 69-45) at 148-50; Pltf. R. 56.1 Stmt. (Dkt. No. 62) ¶ 165) Aly testified that he was no longer able to login to the Beam software after April 12, 2016, because Huang and members of the Reporting

15

Group revoked his access after he left the Reporting Group. (Aly Dep. Tr. (Dkt. No. 69-45) at 149; Dec. 12, 2016 Aly email (Dkt. No. 62-34) at 2)

On November 3, 2016, Aly provided the Commission with an AOL account – mrlibinsun@aol.com – that he claims was used by Sun. (Pltf. R. 56.1 Stmt. (Dkt. No. 62) ¶ 168) In response to a query from the SEC, AOL reported that there is not now, and there has never been, an AOL email account with that address. (See Phillips Email (Dkt. No. 62-35) at 2)

On April 6, 2017, Aly provided the SEC with three other email addresses for Sun – libinsun@aol.com, mrsun@aol.com, and sublibin@aol.com. (Pltf. R. 56.1 Stmt. (Dkt. No. 62) ¶ 170) In response to a subpoena request, AOL conducted a search and informed the SEC that the "email addresses do not exist." (AOL Subpoena Resp. (Dkt. No. 62-36) at 2)

In the spring of 2016, Aly repeatedly refused to speak by telephone with SEC counsel, citing medical reasons. (Pltf. R. 56.1 Stmt. (Dkt. No. 62) ¶ 172; Def. R. 56.1 Stmt. (Dkt. No. 68) ¶ 172) In an email, Aly stated, "I will not be able to talk on phone. I have medical reasons for it. I will try to say something, you won't understand a word of it, or believe that I am saying something completely different. What good will that do? So, in person meeting and phone conversations won't work." (Aly June 24, 2016 email (Dkt. No. 62-27) at 2)

The SEC then took Aly's deposition in Karachi. When asked at the deposition why he refused to speak with the SEC by telephone, Aly stated that he has a "medical condition" called "telephobia," which makes it "extremely difficult" for him to talk on the telephone. (Aly Dep. Tr. (Dkt. No. 69-45) at 158)

16

## I.   SUMMARY JUDGMENT STANDARD

Summary judgment is warranted where the moving party shows that "there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. County of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (quoting Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007)). "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994) (citing Dister v. Cont'l Grp., Inc., 859 F.2d 1108, 1114 (2d Cir. 1988)). "'[T]hat opposing parties assert competing versions of the same event is not in itself sufficient to preclude summary judgment,' in that contradictory testimony only establishes a 'genuine' issue for trial if it 'lead[s] to a different legal outcome.'" Yi Fu Chen v. Spring Tailor, LLC, No. 14 Civ. 218 (PAE), 2015 WL 3953532, at *4 (S.D.N.Y. June 29, 2015) (quoting Krynski v. Chase, 707 F. Supp. 2d 318, 322 (E.D.N.Y. 2009)).

In deciding a summary judgment motion, the Court "'resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment.'" Spinelli v. City of New York, 579 F.3d 160, 166 (2d Cir. 2009) (internal quotation marks and citation omitted) (quoting Brown v. Henderson, 257 F.3d 246, 251 (2d Cir. 2001)). However, a "'party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment. . . . [M]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would

17

otherwise exist.'" Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (alterations in original)

(quoting Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995)). Accordingly, "'a nonmoving

party's self-serving statement, without direct or circumstantial evidence to support the charge, is

insufficient to defeat a motion for summary judgment.'" Walker v. Carter, 210 F. Supp. 3d 487,

503 (S.D.N.Y. 2016) (quoting JF v. Carmel Cent. Sch. Dist., 168 F. Supp. 3d 609, 616 (S.D.N.Y.

2016)).

"The same standard[s] appl[y] where, as here, the parties file[] cross-motions for

summary judgment. . . ." Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001).

"[W]hen both parties move for summary judgment, asserting the absence of any genuine issues

of material fact, a court need not enter judgment for either party. Rather, each party's motion

must be examined on its own merits, and in each case all reasonable inferences must be drawn

against the party whose motion is under consideration." Id. (internal citations omitted).

## II.    DEFENDANT'S MOTION TO STRIKE

Aly has moved to strike Grigoletto's expert report on the grounds that it is

inadmissible under Federal Rules of Evidence 401, 402, 403, and 702. (Def. Br. (Dkt. No. 65) at

1)

### A.    Applicable Law

"On a summary judgment motion, the district court properly considers only

evidence that would be admissible at trial." Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.,

164 F.3d 736, 746 (2d Cir. 1998) (citing Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997)).

Accordingly, "it is appropriate for a district court to decide questions regarding the admissibility

of evidence, including expert opinion evidence, on a motion for summary judgment." Bah v.

Nordson Corp., No. 00-Civ-9060 (DAB), 2005 WL 1813023, at *6 (S.D.N.Y. Aug. 1, 2005)

18

(citing Raskin, 125 F.3d at 66). The principles governing admissibility of evidence on a motion for summary judgment are the same as those that apply at trial. Raskin, 125 F.3d at 66. Whether expert evidence should be admitted on a motion for summary judgment is a matter committed to the district court's "wide discretion." Nora Beverages, Inc., 164 F.3d at 746; Boucher v. U.S. Suzuki Motor Corp., 73 F.3d 18, 21 (2d Cir. 1996).

Under Federal Rule of Evidence 702,

[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

In Daubert v. Merrell Dow Pharm., Inc., the Supreme Court instructed that Rule 702 imposes a "gatekeeping" responsibility on trial courts to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." Daubert, 509 U.S. 579, 589 (1993). "Per Daubert and its progeny, a court's Rule 702 inquiry involves the assessment of three issues: (1) the qualifications of the expert, (2) the reliability of the methodology and underlying data employed by the expert, and (3) the relevance of that about which the expert intends to testify." Washington v. Kellwood Co., 105 F. Supp. 3d 293, 304 (S.D.N.Y. 2015) (citations omitted). The party seeking to rely on expert testimony bears the burden of establishing, by a preponderance of the evidence, that all requirements for admissibility have been met. United States v. Williams, 506 F.3d 151, 160 (2d Cir. 2007).

19

"[W]hether a purported expert is qualified under Rule 702 is an inquiry to be resolved prior to all others." Washington, 105 F. Supp. 3d at 304. "Whether a proposed expert has the requisite qualifications depends on his or her educational background, training, and experience in the field(s) relevant to the opinions he or she seeks to give." S.E.C. v. Tourre, 950 F. Supp. 2d 666, 674 (S.D.N.Y. 2013).

"[C]ourts in this circuit have noted that an expert should not be required to satisfy an overly narrow test of his own qualifications." Arista Records LLC v. Lime Grp. LLC, No. 06 Civ. 5936 (KMW), 2011 WL 1674796, at *3 (S.D.N.Y. May 2, 2011) (internal quotation marks and citations omitted); see also In re Puda Coal Sec. Inc., Litig., 30 F. Supp. 3d 230, 250 (S.D.N.Y. 2014) ("In the Second Circuit, courts have construed the inquiry into an expert's qualifications with an eye towards the liberal thrust of the Federal Rules and their general approach of relaxing the traditional barriers to opinion testimony." (internal quotation marks and citations omitted)). "'In considering a witness's practical experience and educational background as criteria for qualification, the only matter the court should be concerned with is whether the expert's knowledge of the subject is such that his opinion will likely assist the trier of fact in arriving at the truth.'" Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp., No. 04 Civ. 7369 (LTS) (HBP), 2006 WL 2128785, at *5 (S.D.N.Y. July 28, 2006) (quoting Valentin v. New York City, No. 94 Civ. 3911(CLP), 1997 WL 33323099, at *14 (E.D.N.Y. Sept. 9, 1997)). Accordingly, "one may be an expert solely based on one's practical experience notwithstanding a lack of professional education or one's formal education despite a lack of practical experience." Id. (citations omitted).

In assessing reliability, "'the Rule 702 inquiry [i]s 'a flexible one,'" and 'Daubert makes clear that the factors it mentions do not constitute a 'definitive checklist or test.'" United

20

States v. Romano, 794 F.3d 317, 330 (2d Cir. 2015) (quoting Kumho Tire Co. v. Carmichael, 526 U.S. 137, 150 (1999)). Indeed, "the Federal Rules anticipate that '[s]ome types of expert testimony will not rely on anything like a scientific method[,]'" and "[w]hile the requirement of reliability 'applies equally when an expert's testimony is not scientific in nature' the four Daubert factors 'may not be applicable when assessing the testimony of non-scientific experts.'" On Track Innovations Ltd. v. T-Mobile USA, Inc., 106 F. Supp. 3d 369, 411 (S.D.N.Y. 2015) (quoting In re Methyl Tertiary Butyl Ether ("MTBE") Prod. Liab. Litig., No. 00-mdl-1898 (SAS), 2008 WL 1971538, at *3, 6 (S.D.N.Y. May 7, 2008) (quoting Fed. R. Evid. 702 Advisory Committee Note)). Rather, where the method employed involves "the application of experience to facts[,]" the ultimate inquiry is whether the expert testimony is "'properly grounded, well-reasoned, and not speculative[,]' and the expert must 'show how his or her experience . . . led to his conclusion.'" In re Methyl, 2008 WL 1971538, at *6 (quoting Fed. R. Evid. 702 Advisory Committee Note; SR Int'l Bus. Ins. Co. v. World Trade Ctr. Properties, LLC, 467 F.3d 107, 132 (2d Cir. 2006)); see also Louisiana Wholesale Drug Co. v. Sanofi-Aventis, No. 07 Civ. 7343 (HB), 2008 WL 4580016, at *6 (S.D.N.Y. Oct. 14, 2008) ("The standard to evaluate non-scientific expert testimony is whether the expert bases testimony upon professional studies or personal experience and employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." (citations omitted)).

Moreover, "[a] minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion per se inadmissible." Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 267 (2d Cir. 2002)). "The judge should only exclude the evidence if the flaw is large enough that the expert lacks good grounds for his or her conclusions." Id. (internal quotation marks and citations omitted). There must be "a sufficiently

21

rigorous analytical connection between [the expert's] methodology and the expert's conclusions," however. Nimely v. City of New York, 414 F.3d 381, 396 (2d Cir. 2005). "[I]t is critical that an expert's analysis be reliable at every step." Amorgianos, 303 F.3d at 267. "[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert." Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997).

A trial court must also consider whether the expert's testimony is relevant. 523 IP LLC v. CureMD.Com, 48 F. Supp. 3d 600, 644 (S.D.N.Y. 2014) (citation omitted). "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401.

Finally, "[e]xpert testimony must also adhere to the other Federal Rules of Evidence, including Rule 403, which provides that relevant evidence may still be excluded 'if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.'" Arista Records, 2011 WL 1674796, at *4 (quoting Fed. R. Evid. 403).

## B. Analysis

### 1. Grigoletto's Qualifications

Grigoletto holds a bachelor's degree in finance from the University of Miami. (See Grigoletto Decl., Ex. A (Grigoletto Expert Report), Appendix A (Resume) (Dkt. No. 62-19) at 3) He has Series 7, 55, 63 and 65 licenses, and is presently the chief executive officer of Grigoletto Financial Consulting. (See id.; Grigoletto Decl., Ex. A (Grigoletto Expert Report) (Dkt. No. 62-17) ¶ 5)

Grigoletto has more than thirty-five years' experience in trading and investing in options, and has worked as an options market maker, stock specialist, institutional trader, portfolio manager, and educator. (Grigoletto Decl., Ex. A (Grigoletto Expert Report) (Dkt. No. 62-17) ¶ 8) He has developed considerable expertise in portfolio risk management and equity-related instruments. (Id.) From May 1997 to March 2000, Grigoletto served as a portfolio manager at Hull Transaction Services, an arbitrage fund, where he was responsible for the Standard & Poor's 500 Index and the Standard & Poor's MidCap 400 portfolios. (Id.; Grigoletto Decl., Ex. A (Grigoletto Expert Report), Appendix A (Resume) (Dkt. No. 62-19) at 2-3) From March 2000 to June 2011, Grigoletto served as Vice President and Senior Vice President for Chicago Analytical Capital Management and Boston Options Exchange, LLC. (Id. at 2) Thereafter, Grigoletto served as Vice President of the Options Clearing Corporation and head of education for the Options Industry Council, where he was responsible for managing educational outreach efforts to retail investors, financial advisors, and institutional and regulatory authorities. (Grigoletto Decl., Ex. A (Grigoletto Expert Report) (Dkt. No. 62-17) ¶ 6; Grigoletto Decl., Ex. A (Grigoletto Expert Report), Appendix A (Resume) (Dkt. No. 62-18) at 15) He then served as Chief Commercial Officer for Hull Tactical Funds and Ketchum Trading Partners, where he oversaw all daily operational aspects of the funds and analyzed individual and global portfolio risk. (See Grigoletto Decl., Ex. A (Grigoletto Expert Report), Appendix A (Resume) (Dkt. No. 62-18) at 15) Grigoletto then started his own financial consulting firm. (Id.)

Grigoletto has been as a guest speaker at Northwestern's Kellogg School of Management, the University of Chicago, Wharton's Alumni Association, Washington University, the University of Notre Dame, the University of Bologna, the SEC, the Commodity Futures Trading Commission, the Futures Industry Association, a House of Representatives panel debate

23

on penny stock pricing, and the Wall Street Journal's Future of Finance Committee. (See id., Appendix A (Resume) (Dkt. No. 62-19) at 3) The Financial Industry Regulatory Authority ("FINRA") selected Grigoletto to assist in developing the Series 56 proprietary trader examination. (Id.) Grigoletto also has eight published articles concerning investment strategy and call options.[9] (See id. at 4)

This Court concludes that Grigoletto's "knowledge of the subject is such that his opinion will likely assist the trier of fact in arriving at the truth," and that he has sufficient practical experience working in financial markets and portfolio risk management to satisfy the qualifications element under Rule 702. See Johnson & Johnson Vision Care, Inc., 2006 WL 2128785, at *6 (denying motion to exclude expert report because the expert "has significant experience in conducting financial and economic analyses relating to products in the marketplace and has provided such expert opinions in numerous cases"); United States Commodity Futures Trading Comm'n v. Wilson, No. 13 Civ. 7884 (AT), 2016 WL 7229056, at *9 (S.D.N.Y. Sept. 30, 2016) (holding, at summary judgment, "that [the expert's] work experience serving as head of U.S. Commodities Valuation and New Business at Barclays Capital qualifies him as an expert" regarding financial derivatives markets and investment strategy).

---

[9] Plaintiff argues that Grigoletto lacks the necessary experience to offer an expert opinion because he had only one published article at the time the Complaint was filed. (See Def. Br. (Dkt. No. 65) at 6) As discussed above, however, "[c]ourts within the Second Circuit 'have liberally construed expert qualification requirements' when determining if a witness can be considered an expert." Cary Oil Co. v. MG Ref. & Mktg., Inc., No. 99 Civ. 1725 (VM), 2003 WL 1878246, at *1 (S.D.N.Y. Apr. 11, 2003) (citations omitted). In making this determination, courts "look to the totality of the expert's qualifications" and any one or more of the "five forms of qualifications" articulated in Rule 702 – knowledge, skill, experience, training, or education – "will satisfy the rule." See Tiffany (NJ) Inc. v. eBay, Inc., 576 F. Supp. 2d 457, 458 (S.D.N.Y. 2007) (citations omitted). Accordingly, an expert's qualifications do not hinge on the number or timing of his publications.

## 2. **Reliability**

### a. **Opinion that Options Purchase was Highly Speculative**

Grigoletto's opinion regarding the speculative nature of Aly's purchase of 1,850 IDTI call options is properly grounded. In his analysis, Grigoletto relies on facts and data concerning the characteristics of the call options – their cost, strike price, and expiration date – and the listed prices of IDTI securities during the relevant time period. (See Grigoletto Decl., Ex. A (Expert Report) (Dkt. Nos. 62-17, 62-18) ¶¶ 28-34) Grigoletto's opinion "is therefore sufficiently well-grounded in fact." See In re Methyl, 2008 WL 1971538, at *7 (expert's reliance on "facts and data on ethanol and MTBE technical properties, pricing, export and import levels, and processing methods" demonstrates that his conclusions were "properly ground[ed] . . . in substantive facts").

Grigoletto's opinion is also well-reasoned and non-speculative. He "uses his business experience to assess the facts and form conclusions throughout his expert report . . . and explains how he drew on his experience to evaluate certain of those facts." See id. After noting that Aly purchased his call options at a strike price of $20 – while IDTI stock was trading at $19.01 – and that the options were due to expire in three days, Grigoletto explains that Aly was – in effect – making a $20,000 "bet that [] the stock would close above $20.10 . . . within the remaining 3 days." (See Grigoletto Decl., Ex. A (Grigoletto Expert Report) (Dkt. Nos. 62-17, 62-18) ¶¶ 28, 31) Given that Aly's options would expire in three days, "the market expectation" – as reflected in the very low premium of ten cents that Aly paid per share – was that the options would likely prove worthless. (Id. ¶ 31) Grigoletto concludes – based on his "education and experience in options markets," and analysis of these facts – that "the only explanation for Mr. Aly's abnormal, speculative, and risky IDTI option trade is that he was expecting to profit from

25

the increase in IDTI's stock price that would result from his false Schedule 13D filing." (Id. ¶ 34)

Aly contends that Grigoletto's opinion is unreliable because it is "based on the hindsight knowledge that Mr. Aly sold his entire call options after the Schedule 13D filing rather than exercising them into IDTI stock[.]" (Def. Br. (Dkt. No. 65) at 3) Aly's criticism is not supported by the record, however. As noted above, Grigoletto's opinion assesses the riskiness of the options by analyzing the characteristics of call options generally, as well as the circumstances of Aly's trade, including the price of IDTI securities at the time and the three-day period in which the options were exerciseable. (See Grigoletto Decl., Ex. A (Grigoletto Expert Report) (Dkt. Nos. 62-17, 62-18) ¶¶ 28-34) Grigoletto's opinion does not turn on the fact that Aly sold his call options.

Aly also complains that Grigoletto did not consider (1) that Aly could have exercised some or all of the options; (2) that Aly had no plans to sell his IDTI options when he filed the Schedule 13D, and was allegedly "indifferent to how the filing might affect IDTI['s] stock price"; and (3) a statement in the Schedule 13D explaining that the shares were purchased because they were "undervalued and represented an attractive investment opportunity." (See Pltf. Br. (Dkt. No. 65) at 2-3) Grigoletto's analysis turns on the facts surrounding Aly's purchase of the call options, however, and not on Aly's assertions of his subjective state of mind. In any event, Grigoletto's opinion is "not so speculative, conjectural, or based on assumptions so unrealistic and contradictory as to suggest bad faith or to render his opinion inadmissible." See SEC v. Revelation Capital Mgmt., Ltd., 215 F. Supp. 3d 267, 278 (S.D.N.Y. 2016).

Accordingly, Grigoletto's opinion that Aly's options purchase was highly speculative is reliable.

26

### b.    Opinion that the Schedule 13D Was Material

Grigoletto opines that the Schedule 13D was material. (Grigoletto Decl., Ex. A (Grigoletto Expert Report) (Dkt. Nos. 62-17, 62-18) ¶ 53) Grigoletto's opinion is based on his personal experience as an options market maker, data related to prices and trading of IDTI securities on and about April 12, 2016, data related to trading and prices of other securities in comparable companies, and news reports publicizing the contents of Aly's Schedule 13D. (See id. ¶¶ 8, 35-53) Grigoletto explains that because market makers have a small profit margin, they "must monitor all the information associated with a security in real-time in order to adjust their market quotes accordingly." (Id. ¶ 26) Moreover, it is "common for stock prices to react to merger proposals," because "the acquirer typically has to pay a premium for the acquisition." (Id. ¶ 27) Grigoletto further explains that within minutes of the publication of Aly's Schedule 13D, numerous news sources reported a potential merger. (Id. ¶¶ 35-38) Within ten minutes after Bloomberg reported Aly's Schedule 13D filing, IDTI's stock had risen from $19.15 to $23.99, representing a price increase of 26%. (Id. ¶ 38) The volume of trading in IDTI stock traded also sharply rose. (Id. ¶ 41) Moreover, the value of Aly's call options – which he had purchased at a price of 10 cents – rose to $3.70, representing a 3600% increase. (Id. ¶ 44 at 20) Grigoletto also concludes – based on his business experience, and analysis of market activity across the industry and comparable companies – that the increase in IDTI's stock price on April 12, 2016 "cannot be explained by market or industry-related events unrelated to the at-issue Schedule 13D." (Id. ¶¶ 50, 53) Accordingly, Grigoletto concludes that Aly's Schedule 13D "had a material impact on IDTI's stock price and option prices." (Id. ¶ 53)

Aly argues, however, that (1) the Schedule 13D had no material impact on the price of IDTI stock; (2) Grigoletto's use of a 10 minute trading window to calculate the 26

percent increase in IDTI price is arbitrary; and (3) Grigoletto should have extended the event period until the end of trading on April 13, 2016. (Def. Br. (Dkt. No. 65) at 3-6)

None of these arguments justify preclusion of Grigoletto's opinion that the Schedule 13D was material. See On Track Innovations Ltd., 106 F. Supp. 3d at 412. There is nothing arbitrary about Grigoletto's analysis of the sharp rise in IDTI's stock price on April 12, 2016, immediately after publication of Aly's Schedule 13D. Grigoletto also adequately explains that the 26% increase in IDTI's stock price in ten minutes was highly unusual, and sharply contrasts with IDTI's share price and trading volume between April 4, 2016 and April 20, 2016. (See Grigoletto Decl., Ex. A (Grigoletto Expert Report) (Dkt. No. 62-18) ¶¶ 38, 40-45 ("For comparison, in the six trading days prior to and after April 12, 2016, the maximum change in price in any ten minute trading window was only 3 percent." (emphasis in original)).

Moreover, event studies such as that performed by Grigoletto constitute "a well-established method for calculating the effect of an event on stock prices," and are "an accepted method for evaluating materiality." 26A Michael J. Kaufman, Securities Litigation: Damages § 25B:1 (2017); United States v. Hatfield, No. 06 Cr. 0550 (JS) (AKT), 2014 WL 7271616, at *3 (E.D.N.Y. Dec. 18, 2014) ("Properly conducted event studies are widely accepted by courts in this Circuit."). "Event studies are used to determine whether 'the price changes at issue in [a] case were [related or] unrelated to the representations in dispute' by eliminating other factors, such as 'the effects on stock price of market and industry information.'" United States v. Martoma, 993 F. Supp. 2d 452, 458 (S.D.N.Y. 2014) (alteration in original) (quoting In re N. Telecom Ltd. Sec. Litig., 116 F. Supp. 2d 446, 460 (S.D.N.Y. 2000)). Because the efficient market theory counsels that "'information important to reasonable investors . . . is immediately incorporated into the stock price[,]'" Martoma, 993 F. Supp. 2d at 457, an "event window . . .

need not be exceedingly long"; rather the goal is "to select a window long enough so that the period includes the entirety of the market's reaction to the information released." Hatfield, 2014 WL 7271616, at *12.

When used to assess materiality, an expert's event study will

> look[] to the movement, in the period immediately following disclosure, of the price of the firm's stock. . . . [I]f a company's disclosure of information has no effect on stock prices, "it follows that the information disclosed . . . was immaterial. . . . "

Martoma, 993 F. Supp. at 457 (quoting Oran v. Stafford, 226 F.3d 275, 282 (3d Cir. 2000)); see also Reed Const. Data Inc. v. McGraw-Hill Companies, Inc., 49 F. Supp. 3d 385, 400 (S.D.N.Y. 2014) ([T]he plaintiffs' expert was retained to determine whether alleged misconduct had artificially inflated the price of the defendant's securities. . . . To do this, the expert needed to test the volatility of the defendants' stock price on days when allegedly false or corrective disclosures were made."), aff'd, 638 F. App'x 43 (2d Cir. 2016).[10]

That is what Grigoletto did here. He analyzes the movement in IDTI's stock price after the publication of Aly's Schedule 13D on April 12, 2016, and opines – based on the abnormal market volatility following the publication of the Schedule 13D – that it had a material impact on IDTI's stock and options prices. (See Grigoletto Decl., Ex. A (Grigoletto Expert

---

[10] While Aly contends that the event window should have been extended to the day after the event, the cases he cites in support of this argument are inapposite. Those cases used event studies to measure how long it took for the market to absorb corrective, truthful disclosures for purposes of determining loss causation, and do not address the use of event studies to assess the material effect of false information on the market. See Hatfield, 2014 WL 7271616, at *12-13 (discussing appropriate event window for purposes of "quantify[ing] the loss associated with [a corrective] disclosure," and concluding that "leaving the event window open for a full trading day following the announcement contemplates enough time for the news to reach and be digested and acted upon by investors and their clients"). In any event, even in loss causation cases, courts have approved one-day event windows. See In re Barclays Bank PLC Sec. Litig., No. 09 Civ. 1989 (PAC), 2017 WL 4082305, at *24 (S.D.N.Y. Sept. 13, 2017) (plaintiff's challenges to expert's assumptions concerning market efficiency and use of one-day event window "go to the weight, not the admissibility" of the expert testimony).

Report) (Dkt. Nos. 62-17, 62-18) ¶¶ 4, 38-53)  Grigoletto also "'disentangle[s] the effects of company-specific information from market and industry information,'" see Martoma, 993 F. Supp. at 458, through comparison of stock prices across the industry and comparable companies. (See Grigoletto Decl., Ex. A (Grigoletto Expert Report) (Dkt. No. 62-18) ¶¶ 46-50)  Moreover, an extended event study period would make little sense given Aly's second filing at 12:44 p.m., announcing that he had sold all of his call options and that the Reporting Group no longer held a more than five percent stake in IDTI. (See Am. Schedule 13D (Dkt. No. 62-15) at 19)

The Court concludes that Grigoletto's opinion regarding materiality is reliable.

### c.    Opinion that Aly's Schedule 13D Is False

Aly contends that Grigoletto's conclusions regarding the falsity of the Schedule 13D are unreliable because (1) Grigoletto limits his analysis to whether Libin Sun owned any listed securities; (2) FINRA's Large Options Positions Reporting system is unreliable due to non-compliance with the reporting requirements; and (3) Grigoletto did not personally review the Large Options Positions report. (See Def. Br. (Dkt. No. 65) at 7-10)

As an initial matter, Grigoletto did not limit his analysis to listed securities. Grigoletto's opinions are based on publicly available securities and trading data, Chicago Board of Options Exchange Livevol data, historical options data for listed options, as well as Large Options Positions system data regarding over-the-counter (i.e., unlisted) securities. (See Grigoletto Decl., Ex. A (Grigoletto Expert Report) (Dkt. Nos. 62-17, 62-18) ¶¶ 11, 55-62) Grigoletto also employed Options Research and Trading Systems software to examine historical bid-ask spreads, open interest figures, and trading volumes for IDTI securities. (Id. ¶¶ 11, 58-60)

Grigoletto's conclusion that the Schedule 13D is false is well-reasoned and not speculative. Grigoletto explains that the Schedule 13D reports that a Chinese citizen named

30

Libin Sun owns 2,410,866 shares of IDTI and call options for an additional 3.6 million IDTI.

Shares. Collectively, these holdings would represent a 4.4% stake in IDTI. (Id. ¶ 54) Grigoletto

concludes that this representation is false, and that the reported option holdings do not exist. He

relies on the following:

- The extraordinarily low strike prices. The Schedule 13D reports that Sun owns call options on 3.6 million shares with strike prices ranging from $0.25 to $0.38. Grigoletto explains that – based on his experience – "[t]hese reported strike prices are nonsensical and far too low" in comparison with typical strike prices. (Id. ¶ 55)

- The fact that call options with the specific November expiration dates reported in the Schedule 13D did not exist "[u]p to and including the date of the Schedule 13D filing." (Id. ¶ 56)

- A statement in the Schedule 13D that the call options were purchased more than 60 days before the April 12, 2016 filing of the Schedule 13D. (Id. ¶ 57) Grigoletto explains that call options with November expiration dates were not available until March 21, 2016, which is within sixty days of the Schedule 13D filing. (Id.)

- The enormous size of the option position. (Id. ¶ 58) Grigoletto explains that open interest would reflect the held options in IDTI call options, and that between March 21, 2016 (the first listed trading day for IDTI options expiring in November) and April 12, 2016, the maximum total interest only reflected 31 contracts across all strikes. (Id. ¶ 59) Mr. Grigoletto concludes that there was "not nearly enough open interest in all IDTI November call options for Libin Sun to have acquired call options representing 3,600,000 shares of IDTI." (Id.)

- An examination and query of the Large Options Positions Reporting system by SEC staff, which revealed that no over-the-counter position reflecting 36,000 IDTI call options – as described in the Schedule 13D – existed. (Id. ¶ 60; McCluskey Decl. (Dkt. No. 7) ¶ 35) Grigoletto explains that FINRA rules require all FINRA members to report positions in conventional or over-the-counter options if they meet a 200-contract threshold. (Grigoletto Decl., Ex. A (Grigoletto Expert Report) (Dkt. No. 62-17) ¶ 60) If the option position reported in the Schedule 13D existed, it should have been reported in the Large Options Positions reporting system. (See id. ¶¶ 60-61)

Aly's argument about the unreliability of the Large Options Positions Reporting

system is unpersuasive. The Second Circuit has instructed that expert testimony should be

excluded only "if it is based on assumptions that are 'so unrealistic and contradictory as to suggest bad faith' or to be in essence an 'apples and oranges comparison.'" Boucher, 73 F.3d at 21 (quoting Shatkin v. McDonnell Douglas Corp., 727 F.2d 202, 208 (2d Cir. 1984)). "[O]ther contentions that the assumptions are unfounded 'go to the weight, not the admissibility, of [expert evidence].'" Id. (citations omitted). Accordingly, Aly's arguments concerning reporting non-compliance "go to the weight of the evidence, not to its admissibility." See Tiffany (NJ) Inc. v. eBay, Inc., 576 F. Supp. 2d 457, 459 (S.D.N.Y. 2007) (defendant's argument that survey was unreliable due to "methodological and implementation errors" went to the weight of the expert testimony, not its admissibility).

Moreover, Grigoletto was entitled to rely on data provided by the SEC. "Under Federal Rule of Evidence 703, '[a]n expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed.'" SLSJ, LLC v. Kleban, No. 14 Civ. 390 (CSH), 2017 WL 4329732, at *17 (D. Conn. Sept. 29, 2017); In re M/V MSC FLAMINIA, No. 12 Civ. 8892 (KBF), 2017 WL 3208598, at *22 (S.D.N.Y. July 28, 2017) ("Rule 703 'does not predicate admissibility on the source of the facts or data.'" (citations omitted)). "[I]f 'experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.'" SLSJ, LLC, 2017 WL 4329732, at *17 (quoting Fed. R. Evid. 703). Accordingly, Grigoletto properly relied on the Large Options Positions Reporting data in reaching his conclusions. (See Grigoletto Decl., Ex. A (Grigoletto Expert Report) (Dkt. No. 62-17) ¶¶ 11, 60-61 n. 51 (citing McCluskey Decl. (Dkt. No. 7) ¶ 35))

Aly's also complains that he never had an opportunity to review the Large Options Positions Reporting system (see Def. Br. (Dkt. No. 65) at 7), but discovery closed on

32

May 15, 2017 (see Dkt. Nos. 35, 54), and Aly did not serve a request for production of documents until August 30, 2017. (See Req. Produc. Docs. (Dkt. No. 78); Sept. 11, 2017 Def. Ltr. (Dkt. No. 79-1)) Given Aly's failure to timely request documents, he cannot now complain that he was not given access to the Large Options Positions Reporting system.

The Court concludes that Grigoletto's opinion concerning the falsity of the Schedule 13D is reliable.

### 3. **Rule 401 and Rule 403 Considerations**

The SEC retained Grigoletto in order to (1) provide an overview of call options and the impact of new information on these types of options and the underlying stock; (2) assess Aly's options trading strategy in relation to his Schedule 13D filing; (3) evaluate the materiality of Aly's Schedule 13D filing on IDTI's stock prices; and (4) determine the truth or falsity of certain statements in Aly's Schedule 13D filing. (See Grigoletto Decl., Ex. A (Grigoletto Expert Report) (Dkt. No. 62-17) ¶ 2)

As discussed above, the Court finds Grigoletto's opinions concerning the following matters reliable: (1) the speculative nature of Aly's call options purchase, absent his filing of the Schedule 13D minutes later; (2) the material impact of the filing of the Schedule 13D; and (3) the falsity of the Schedule 13D, particularly as to the holdings of Libin Sun.

Given the Complaint's allegations of market manipulation and securities fraud, Grigoletto's analysis and conclusions concerning Aly's investment strategy, the materiality of the Schedule 13D on IDTI's stock price, and the falsity of the statements contained in the Schedule 13D are all highly relevant. See Tiffany (NJ) Inc., 576 F. Supp. 2d at 459 ("In assessing the relevance of proffered expert testimony, the Court looks to whether the testimony has any tendency to make the existence of any fact that is of consequence to the determination of the

33

action more probable or less probable than it would be without the evidence." (citing Amorgianos, 303 F.3d at 265)).

Moreover, there is no evidence that this Court's consideration of Grigoletto's expert report would be unfairly prejudicial under Federal Rule of Evidence 403. "To the extent that [Aly] wishes to challenge [Grigoletto's] methodology [or analysis], those concerns go to the weight of the evidence, not to its admissibility." See id.

Accordingly, Aly's motion to strike will be denied.

## III.   CROSS-MOTIONS FOR SUMMARY JUDGMENT

In moving for summary judgment, the SEC argues that no rational factfinder could find in favor of Aly. Accordingly, there is no genuine issue of material fact that Aly violated Section 17(a) of the Securities Act, and Section 10(b) of the Securities Exchange Act and Rule 10b-5. (Pltf. Br. (Dkt. No. 61) at 18-19)

Aly cross-moves for summary judgment, arguing that (1) he "believed, and had no reason to believe otherwise, that all the material information in both the Schedule 13D filings was true, complete, and correct"; and (2) the Schedule 13D filings "contained no misstatements or omissions of material fact." (Def. Br. (Dkt. No. 67) at 1)

### A.   Applicable Law

Section 17(a) of the Securities Act of 1933 makes it unlawful "for any person in the offer or sale of any securities," by use of any means or instrumentality of interstate commerce, directly or indirectly

  (1) to employ any device, scheme, or artifice to defraud, or

  (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

34

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a).

Section 10(b) of the Securities Exchange Act "prohibits both sellers and buyers of securities, using the mails or an instrumentality of interstate commerce or the facility of a national securities exchange, from employing 'any manipulative or deceptive device or contrivance in contravention of [SEC] rules and regulations.'" SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1466 (2d Cir. 1996) (alteration in original) (quoting 15 U.S.C. § 78j(b)).

Rule 10b-5 makes it unlawful for any person to use any means or instrumentality of interstate commerce,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

The Second Circuit has stated that "[e]ssentially the same elements are required under Section 17(a)(1)-(3) in connection with the offer or sale of a security" as under Section 10(b) and Rule 10b-5. SEC. v. Monarch Funding Corp., 192 F.3d 295, 308 (2d Cir. 1999) (citing First Jersey Sec., Inc., 101 F.3d at 1467). In order to establish liability, the SEC must show that the defendant: "(1) made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the

35

purchase or sale of securities."[11] Id. (citations omitted). "The element of scienter, as used in connection with the securities fraud statutes, requires a plaintiff to show that the defendant acted with intent to deceive, manipulate or defraud, or at least knowing misconduct." Grandon v. Merrill Lynch & Co., 147 F.3d 184, 194 (2d Cir. 1998) (citations omitted). "Scienter, however, need not be established for the SEC to obtain an injunction under [] §§ 17(a)(2) or (3)." First Jersey Sec., Inc., 101 F.3d at 1467 (citing Aaron v. SEC, 446 U.S. 680, 701-02 (1980)).

## B. Whether Aly Made a Material Misstatement

### 1. Aly as Maker

"[T]he maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." Janus Capital Grp., Inc. v. First Derivative Traders, 564 U.S. 135, 142 (2011). "[A]ttribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by – and only by – the party to whom it is attributed." In re Smith Barney Transfer Agent Litig., 884 F. Supp. 2d 152, 164 (S.D.N.Y. 2012) (quoting Janus, 564 U.S. at 142-43)). Accordingly, courts "consistently hold that signatories of misleading documents 'made' the statements in those documents." Id. at 163-64 (S.D.N.Y. 2012) (collecting cases); see also In re Stillwater Capital Partners Inc. Litig., 858 F. Supp. 2d 277, 287-88 (S.D.N.Y. 2012) ("Janus, which involved two separate entities and whether statements of one could be attributed to the other, cannot be used to shield [defendant], who signed the documents at issue and thereby 'made' the alleged misstatements.").

---

[11] "Unlike private litigants, who must comply with the [Private Securities Litigation Reform Act], the SEC is not required to prove investor reliance, loss causation, or damages in an action for securities fraud." S.E.C. v. Lee, 720 F. Supp. 2d 305, 325 (S.D.N.Y. 2010) (citing SEC v. Simpson Capital Mgmt., 586 F. Supp. 2d 196, 201 (S.D.N.Y. 2008)).

Here, it is undisputed that Aly signed the Schedule 13D, and that the Schedule 13D lists Aly's name – with an apparently false Portland, Oregon address – on the first page. (Pltf. R. 56.1 Stmt. (Dkt. No. 62) ¶¶ 48-49; Def. R. 56.1 Stmt. (Dkt. No. 68) ¶¶ 48-49; Schedule 13D (Dkt. No. 69-1) at 2, 27-28) "By signing the SEC filings at issue here, [Aly] attested to their accuracy," and he is the "maker" of any false or misleading statements contained therein. See In re Smith Barney Transfer Agent Litig., 884 F. Supp. 2d at 164.

## 2. Materiality

"As a general matter, Section 10(b), Rule 10b-5 and Section 17(a) require that when a company (or individual) 'speaks,' it must disclose all information necessary to make its statement(s) not materially misleading – even where there is otherwise no independent duty to disclose." SEC v. Thompson, 238 F. Supp. 3d 575, 597 (S.D.N.Y. 2017) (collecting cases); In re Vivendi, S.A. Sec. Litig., 838 F.3d 223, 258 (2d Cir. 2016) ("It is well-established precedent in this Circuit that 'once a company speaks on an issue or topic, there is a duty to tell the whole truth,' '[e]ven when there is no existing independent duty to disclose information' on the issue or topic." (quoting Meyer v. Jinkosolar Holdings Co., Ltd., 761 F.3d 245, 250 (2d Cir. 2014)). Accordingly, "'so-called 'half-truths' – literally true statements that create a materially misleading impression – will support claims for securities fraud.'" Wilson v. Merrill Lynch & Co., 671 F.3d 120, 130 (2d Cir. 2011) (quoting SEC v. Gabelli, 653 F.3d 49, 57 (2d Cir. 2011)).

Misstatements or omissions are material if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'" Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988) (quoting TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 448 (1976)). "[S]pecific information pertaining to a proposed corporate acquisition, tender offer, or merger is

quintessentially material." SEC. v. Gonzalez de Castilla, 145 F. Supp. 2d 402, 412 (S.D.N.Y. 2001) (collecting cases); SEC v. Suman, 684 F. Supp. 2d 378, 388 (S.D.N.Y. 2010) ("A reasonable investor would have wanted information about the merger, if only to take advantage of the likelihood that the news would increase the share price as, in fact, it did." (citations omitted)), aff'd, 421 F. App'x 86 (2d Cir. 2011). Market reaction to information regarding a potential tender offer or merger underscores its materiality. See SEC v. Warde, 151 F.3d 42, 47 (2d Cir. 1998) ("The materiality of [defendant's] information [regarding a potential tender offer] is . . . not open to doubt . . . as confirmed by the fact that the stock price jumped when this information was made public."); Suman, 684 F. Supp. 2d at 388 ("The spike in the price of the stock on the date of the tender offer underscores the materiality of [defendant's] non-public information.").

Here, there are multiple false and misleading statements in the Schedule 13D. As an initial matter, the Schedule 13D states that the Reporting Group holds a 5.1% interest in IDTI, including a 4.4% interest held by Sun. (Pltf. R. 56.1 Stmt. (Dkt. No. 62) ¶ 52; Def. R. 56.1 Stmt. (Dkt. No. 68) ¶ 52; Schedule 13D (Dkt. No. 69-1) at 5-18) Sun's stake in IDTI purportedly consisted of 2,410,886 shares of IDTI stock, along with 36,000 options contracts – corresponding with 3.6 million shares of IDTI stock – with strike prices ranging from $0.25 to $0.38 and exercisable between November 3, 2016 and November 14, 2016. (Pltf. R. 56.1 Stmt. (Dkt. No. 62) ¶¶ 54-55; Def. R. 56.1 Stmt. (Dkt. No. 68) ¶¶ 54-55; Schedule 13D (Dkt. No. 69-1) at 5-6)

There is no evidence that an individual named Libin Sun held a 4.4% interest in IDTI, however. To the contrary, Grigoletto's expert report concludes – for reasons discussed at

length above – that Sun's reported holding of 36,000 call options did not exist. (See supra pp. 7, 31)

There is likewise no evidence that Sun held 2,410,886 shares of IDTI stock. To the contrary, the records of IDTI's transfer agent, and the records of custodian banks and broker dealers that held IDTI stock on April 11, 2016 – the day before Aly filed the Schedule 13D – reveal that no one named Libin Sun was listed as a beneficial owner of any IDTI stock. (McCluskey Decl. (Dkt. No. 62-l20) ¶¶ 11-13) Based on the size of Sun's reported holdings – more than 2 million shares of common stock – his stock position would likely be held at one or more of the financial institutions holding IDTI stock. (Id. ¶ 13) None of the records of these institutions show Libin Sun as a holder of IDTI stock between April 7 and April 11, 2016, however. (Id. ¶ 13) [12]

The Schedule 13D also states that the Reporting Group sent a letter to IDTI's board of directors offering to acquire all of the outstanding shares of IDTI common stock for $32.00 per share in cash, and a copy of the purported proposal letter and draft merger agreement is attached to the Schedule 13D. (Schedule 13D (Dkt. No. 62-11) at 21, 28-29) Although Aly sent an email with the proposal letter to IDTI's general investor relations mailbox and IDTI's outside public relations firm at 12:06 p.m. on April 12, 2016 – two minutes before he filed the Schedule 13D – no one at IDTI had received, or heard of, an offer to acquire all of IDTI's outstanding shares at the time of the Schedule 13D filing. (See April 12, 2016 Aly email (Dkt. No. 62-22) at 2l; Brandalise Decl. (Dkt. No. 62-21) ¶ 7-10, 12-13) Indeed, IDTI's senior management did not learn of Aly's April 12, 2016 email until August 18, 2016. (Brandalise

---

[12] Although Aly disputes these facts, he has provided no contrary admissible evidence. (See Def. R. 56.1 Stmt. (Dkt. No. 68) ¶¶ 53, 56-57)

Decl. (Dkt. No. 62-21) ¶ 12) Given all of the circumstances, no rational factfinder could find that Aly was part of a group that was pursuing a tender offer for IDTI.

Moreover, the draft merger agreement attached to the Schedule 13D falsely indicated that the Reporting Group would use two Delaware corporations – Sun Parent, Inc. and Sun Merger Sub, Inc. – to acquire IDTI. (See Schedule 13D (Dkt. No. 69-1) at 39) It is undisputed, however, that neither SUN Parent, Inc., nor SUN Merger Sub, Inc. actually existed as of April 12, 2016. (Pltf. R. 56.1 Stmt. (Dkt. No. 62) ¶ 71)[13]

Aly's misstatements concerning a purported tender offer for IDTI were highly material. Indeed, "[f]ew matters are more material than a corporation's involvement in a possible merger or acquisition." SEC. v. Sekhri, No. 98 Civ. 2320 (RPP), 2002 WL 31100823, at *13 (S.D.N.Y. July 22, 2002); see also SEC v. Materia, 745 F.2d 197, 199 (2d Cir. 1984) ("Because even a hint of an upcoming tender offer may send the price of the target company's stock soaring, information regarding the identity of a target is extremely sensitive."). And "the materiality of the information is confirmed by the substantial increase in the stock price [of IDTI]" upon the filing of the Schedule 13D on April 12, 2016. See, e.g., Sekhri, 2002 WL 31100823, at *13.

Aly's reliance on the "bespeaks-caution" doctrine to attempt to insulate himself from liability is misplaced. (See Def. Br. (Dkt. No. 67) at 18-19) The common law "bespeaks caution" doctrine provides that "forward-looking statements are non-actionable if they are

---

[13] Aly asserts that the attached merger agreement was a draft, and that the "names and domiciles of the entities in the Draft Merger Agreement" were only "intended to inform IDTI that the Parent would be a Delaware corporation." (Aly Decl. (Dkt. No. 69) at 5) There is no evidentiary support for Aly's assertion, however. Because Aly's assertion is merely a "'self-serving statement, without direct or circumstantial evidence to support [it], [the assertion] is insufficient to defeat a motion for summary judgment.'" Walker, 210 F. Supp. 3d at 503 (citations omitted).

40

accompanied by sufficient cautionary language." Thompson, 238 F. Supp. 3d at 602. Here, the doctrine does not apply, because the Schedule 13D's statements concerning the Reporting Group's stake in IDTI and the proposal letter to IDTI's Board of Directors constitute statements "concerning present facts, not forward-looking statements." See id. at 603. The doctrine is likewise inapplicable because Aly did not warn the market that the reported stake in IDTI was fabricated, or that the proposed tender offer was unlikely to come to fruition. See P. Stolz Family P'ship L.P. v. Daum, 355 F.3d 92, 97 (2d Cir. 2004) (The bespeaks-caution doctrine only applies when the document "warns of the specific contingency that lies at the heart of the alleged misrepresentation.").

The Court concludes as a matter of law that the Schedule 13D contains material misstatements.

## C. Use of a Fraudulent Scheme

The SEC also contends that Aly violated Section 10(b), Rule 10b-5, and Section 17(a)(1) and (3) through the use of a fraudulent scheme. (Pltf. Br. (Dkt. No. 61) at 23)

"'Section 17(a)(1) and (3) of the Securities Act and Section 10(b) of the Securities Exchange Act and Rules 10b–5(a) and (c) thereunder create what courts have called 'scheme liability' for those who, with scienter, engage in deceitful conduct.'" SEC v. Wey, 246 F. Supp. 3d 894, 915 (S.D.N.Y. 2017) (quoting SEC v. Jean–Pierre, No. 12 Civ. 8886 (LGS), 2015 WL 1054905, at *8 (S.D.N.Y. Mar. 9, 2015)). "Claims for scheme liability 'hinge[] on the performance of an inherently deceptive act that is distinct from an alleged misstatement.'" Id. (alterations in original) (quoting SEC v. Kelly, 817 F. Supp. 2d 340, 344 (S.D.N.Y. 2011)); SEC v. Penn, 225 F. Supp. 3d 225, 235 (S.D.N.Y. 2016) ("[T]he SEC needs to show that what occurred was an 'inherently deceptive act' and not just a misleading statement." (citations

41

omitted)).

Here, it is undisputed that Aly submitted two Form ID Applications to EDGAR – one in his own name, and one in the name of "Edgar Solutions" – and obtained CIK codes for both accounts, which allowed him to file documents on EDGAR. (Pltf. R. 56.1 Stmt. (Dkt. No. 62) ¶¶ 29-30; Def. R. 56.1 Stmt. (Dkt. No. 68) ¶¶ 29-30) On April 12, 2016, Aly purchased 1,850 call options for IDTI stock at 11:50 a.m. (Pltf. R. 56.1 Stmt. (Dkt. No. 62) ¶ 33; Def. R. 56.1 Stmt. (Dkt. No. 68) ¶ 33) He then used his Edgar Solutions account to file the Schedule 13D, and sold his call options between 12:18 p.m. and 12:20 p.m. at artificially inflated prices, making a profit of more than $425,000. (See Pltf. R. 56.1 Stmt. (Dkt. No. 61) ¶¶ 46-47, 82-83; Def. R. 56.1 Stmt. (Dkt. No. 61) ¶¶ 46-47, 82-83)

Accordingly, "the 'core misconduct'" here is not a misstatement." See SEC v. Garber, 959 F. Supp. 2d 374, 381 (S.D.N.Y. 2013). Aly's use of his Edgar Solutions account to file the Schedule 13D "'conveyed an impression that was misleading,'" because it suggested that the Schedule 13D was filed by someone other than Aly. See VanCook v. S.E.C., 653 F.3d 130, 139-40 (2d Cir. 2011) (defendant's acts constituted a fraudulent scheme because he designed and operated a late-trading scheme, and took numerous steps to hide it, including using time-stamped trade sheets to conceal that his customers made trading decisions after the close of trading). The misstatements in the Schedule 13D were an "instrumentality of the 'inherently deceptive act'" of filing the Schedule 13D in order to artificially inflate the price of IDTI stock, so that Aly could sell his IDTI call options at a substantial profit. See Garber, 959 F. Supp. 2d at 381 (holding that defendant's misstatements "were a mere instrumentality of the 'inherently deceptive act' of acquiring and illegally reselling unregistered penny stock, which involved numerous steps including buying the penny stocks at a discounted price and dumping the penny stocks into the

42

market."); In re Glob. Crossing, Ltd. Sec. Litig., 322 F. Supp. 2d 319, 337 (S.D.N.Y. 2004)

("Schemes used to artificially inflate the price of stocks by creating phantom revenue fall

squarely within both the language of section 10(b) and its broad purpose."). Aly's multi-step

course of deceptive conduct – which went beyond the misrepresentations in the Schedule 13D –

clearly constitutes a fraudulent scheme. See SEC v. Pentagon Capital Mgmt. PLC, 725 F.3d 279,

287 (2d Cir. 2013) (Defendant's "late trading activity, beyond the communication of the trades

themselves, includ[ing] finding brokers and a clearing system that would allow late trades, as

well as the specific coordination . . . of the transmission of instructions . . . satisfy the

requirements of scheme liability.").

### D. **Scienter**

"Scienter, as used in connection with the securities fraud statutes, means intent to

deceive, manipulate, or defraud, . . . or at least knowing misconduct." First Jersey Sec., Inc., 101

F.3d at 1467 (internal citations omitted); Aaron v. SEC, 446 U.S. 680, 686 n. 5 (1980). "Facts

showing motive and opportunity to commit fraud, such as that a defendant 'benefitted in some

concrete and personal way from the purported fraud,'" establish scienter. SEC. v. Boock, No. 09

Civ. 8261 (DLC), 2011 WL 3792819, at *23 (S.D.N.Y. Aug. 25, 2011) (quoting ECA, Local 134

IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 198 (2d Cir.

2009)); SEC v. Todt, No. 98 Civ. 3980 (JGK), 2000 WL 223836, at *9 (S.D.N.Y. Feb. 25, 2000),

aff'd, 7 F. App'x 98 (2d Cir. 2001). Scienter may also be established "'by facts that constitute

strong circumstantial evidence of conscious misbehavior or recklessness.'" S.E.C. v. Stanard,

No. 06 Civ. 7736 (GEL), 2009 WL 196023, at *27 (S.D.N.Y. Jan. 27, 2009) (quoting Stevelman

v. Alias Research Inc., 174 F.3d 79, 84 (2d Cir. 1999)); JP Morgan Chase Co., 553 F.3d at 198.

43

Here, the record is replete with undisputed facts that demonstrate motive and provide strong circumstantial evidence of conscious misbehavior or recklessness. As an initial matter, Aly's motive is "amply demonstrated from the benefits he received from the [s]cheme," see Boock, 2011 WL 3792819, at *24, and the temporal proximity between Aly's filing of the Schedule 13D and Aly's sale of his call options. See SEC v. Dubovoy, No. 15 Civ. 6076, 2016 WL 5745099, at *5 (D.N.J. Sept. 29, 2016) (temporal proximity between the trades and the publication of the press releases support an inference of intent to participate in the fraud). Aly filed the Schedule 13D at 12:08 p.m., and approximately ten minutes later, he sold his call options for $447,740 – reaping a profit of more than $425,000.[14] (See Pltf. R. 56.1 Stmt. (Dkt. No. 62) ¶¶ 35-36, 81-83; Def. R. 56.1 Stmt. (Dkt. No. 68) ¶¶ 35-36, 81-83)

The risky and highly speculative nature of Aly's investment provides additional circumstantial evidence of intent. Because Aly purchased IDTI call options that were about a dollar out-of-the money (i.e., the strike price was above the current market value of the underlying stock) with only three days until expiration, the options were likely to be worthless, and Aly would lose his entire investment of nearly $20,000. (Grigoletto Decl., Ex. A (Grigoletto Expert Report) (Dkt. No. 62-17) ¶ 31) His investment was rational only if he knew that the value of IDTI stock was about to quickly increase, as a result of the filing of the Schedule 13D. Aly conceded as much at his deposition, testifying that (1) at the time he purchased his call options, he knew the Schedule 13D would be filed; and (2) he decided to purchase the IDTI call options because he believed the "stock was undervalued" and the stock price would increase. (See Pltf.

---

[14] Aly does not dispute these facts, but contends that all events that occurred after the filing of the Schedule 13D are irrelevant. (See Def. R. 56.1 Stmt. (Dkt. No. 68) ¶ 81-84) Aly's conduct shortly after he filed the Schedule 13D is highly probative of his state of mind at the time he filed the Schedule 13D, however.

44

R. 56.1 Stmt. (Dkt. No. 62) ¶¶ 119-21; Def. R. 56.1 Stmt. (Dkt. No. 68) ¶¶ 119-21; Aly Dep. Tr. (Dkt. 69-45) at 99; Aly Dep. Tr. (Dkt. No. 62-42) at 30-31)

Although Aly contends now that he believed that "all the material information" in the Schedule 13D filing was true (see Def. Br. (Dkt. No. 67) at 1), Aly knew that the information in the draft merger agreement attached to the Schedule 13D falsely indicated that the Reporting Group would use two Delaware corporations – Sun Parent, Inc. and Sun Merger Sub, Inc. – to acquire IDTI. (See Schedule 13D (Dkt. No. 69-1) at 39) Indeed, Aly concedes that these entities did not exist at the time the Schedule 13D was filed. (Pltf. R. 56.1 Stmt. (Dkt. No. 62) ¶ 71; Def. R. 56.1 Stmt. (Dkt. No. 68) ¶ 72) Although Aly attempts to explain this discrepancy by arguing that the merger agreement was merely a draft, the fact remains that Aly does not dispute that the Schedule 13 D "w[as] misleading at best." See SEC v. Universal Express, Inc., 475 F. Supp. 2d 412, 427-28 (S.D.N.Y. 2007), aff'd sub nom. SEC v. Altomare, 300 F. App'x 70 (2d Cir. 2008). And Aly "submit[s] nothing to show that [his] 'disregard of [such a] [misstatement]' was not at the least reckless." See id.

Aly's fanciful story about Sun and his advisors, and his self-serving assertion that – at the time he filed the Schedule 13D – he "had no plans to sell [his] IDTI call options and was indifferent to how the filing might affect IDTI['s] stock price" (see Aly Decl. (Dkt. No. 69) ¶ 13), do not create a genuine issue of material fact as to scienter. Indeed, "'[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.'" Boock, 2011 WL 3792819, at *13 (quoting Scott v. Harris, 550 U.S. 372, 380 (2007)); see also DeFabio v. E. Hampton Union Free Sch. Dist., 623 F.3d 71, 81 (2d Cir. 2010) ("To defeat summary judgment . . . nonmoving parties must do more

45

than simply show that there is some metaphysical doubt as to the material facts, . . . and they 'may not rely on conclusory allegations or unsubstantiated speculation." (internal quotation marks and citations omitted)). Here, Aly has provided no corroborating evidence to support his outlandish story, and "[n]o reasonable jury could believe [it] in the face of the overwhelming contrary evidence." See Boock, 2011 WL 3792819, at *14, 24 (granting summary judgment to SEC and rejecting defendant's story, given "the absence of almost any evidence[] that his identity was stolen by his friends and business associates, with whom he still is on good terms, . . . in order to accomplish ends that directly benefited him").

The SEC has demonstrated as a matter of law that Aly had the requisite level of scienter.

## E.   In Connection with the Purchase or Sale of Securities

A statement or omission is "in connection with" the purchase or sale of a security for purposes of Section 10(b) of the Exchange Act "if it 'somehow touches upon' or has 'some nexus' with 'any securities transaction.'" Stanard, 2009 WL 196023, at *27. Section 2(a)(3) of the Securities Act "defines 'sale' to include 'every contract of sale or disposition of a security or interest in a security, for value'; and 'offer' to include 'every attempt or offer to dispose of . . . a security or interest in a security, for value." Id. (quoting 15 U.S.C. § 77b(a)(3)).

Aly's sale of his IDTI call options clearly satisfies Section 17(a)'s "in the offer or sale" requirement, as well as Section 10(b)'s "in connection with the purchase or sale" requirement. Moreover, because the false statements in the Schedule 13D were made in "public filings with the SEC, [and] were available to investors and potential investors in [IDTI] stock, which was actively traded at the time[,] . . . the false statements at issue were 'in connection

46

with' the purchase or sale" or "offer or sale" of a security under Section 10(b) and Section 17(a).[15] See id.

Accordingly, the SEC is entitled to summary judgment on its claims, and Aly's cross-motion for summary judgment will be denied.

## CONCLUSION

For the reasons stated above, Plaintiff's motion for summary judgment (Dkt. No. 60) is granted, and Defendant's motion for summary judgment and motion to strike (Dkt. Nos. 65, 66) are denied. The Clerk of Court is directed to terminate the motions (Dkt. Nos. 60, 65, 66).

Plaintiff will submit briefing on appropriate remedies by April 6, 2018, and Defendant will submit any opposition by April 12, 2018.

Dated: New York, New York
March 27, 2018

SO ORDERED.

Paul G. Gardephe
United States District Judge

---

[15] There is no dispute that an instrumentality of interstate commerce was used in furtherance of the fraud scheme. (See Pltf. R. 56.1 Stmt. (Dkt. No. 62) ¶ 178; Def. R. 56.1 Stmt. (Dkt. No. 68) ¶ 178) For example, it is undisputed that Aly used the Internet to access and file documents on EDGAR, and "the use of the Internet is an 'instrumentality of interstate commerce.'" SEC v. Straub, 921 F. Supp. 2d 244, 262 (S.D.N.Y. 2013).